POLYCON INDUSTRIES, INC., Plaintiff,

v.

HERCULES INCORPORATED,
Defendant (two cases).

HERCULES INCORPORATED, Plaintiff,

v.

POLYCON INDUSTRIES, INC.,
Defendant.

Nos. 75–C–182, 75–C–337 and 75–C–394.

United States District Court,
E. D. Wisconsin.

June 4, 1979.

Foley & Lardner by Robert A. DuPuy, Maurice J. McSweeney, Milwaukee, Wis., for plaintiff.

Borgelt, Powell, Peterson & Frauen by Reuben W. Peterson, Jr., Edmund W. Powell, Milwaukee, Wis., for defendant.

DECISION and ORDER

MYRON L. GORDON, District Judge.

These actions, which were consolidated for trial, are before me for a decision on the merits. The record consists of the testimony, depositions and exhibits received in eight days of hearings, and the stipulated facts contained in the parties' pretrial report. I adopt such stipulated facts in their entirety, although I will make specific reference only to those portions which will help explain my resolution of the issues. This decision shall constitute my findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## I. BACKGROUND AND FACTUAL MATTERS

Baker Plastics, located in Williamston, Michigan, was a division of Haskon, Inc., a wholly-owned subsidiary of Hercules, Inc., a Delaware corporation, at all times relevant to these suits. Hercules and Baker Plastics will be referred to collectively as "Baker."

Polycon Industries, Inc. (Polycon), is a wholly-owned subsidiary of Crown Glass, Inc., an Illinois corporation.

I find that jurisdiction exists under 28 U.S.C. § 1332(a), there being diversity of citizenship between the parties and the requisite amount in controversy.

These actions concern three blowmolding machines manufactured by Baker and sold to Polycon. These machines are called the B–100, the TA and the TB. In general terms, the dispute pits Polycon's contention that the machines did not work properly against Baker's contention that Polycon's production problems stemmed from the fault of Polycon's own employees rather than the machines. Polycon seeks to recover the sums paid to Baker for the three machines, its "cost of cover" with other machines, and lost profits in sales that it would have made if the machines worked properly. Baker originally sought the balance due on the machines and certain other damages but, after the action commenced, the parties agreed, in the interests of mitigating both parties' damages, that the machines would be returned to Baker. As a result, Baker has now abandoned its claims for damages. (Posttrial brief of Hercules, Inc., p. 37).

The blowmolding machines in question produce plastic containers designed to hold liquid consumer products. Plastic is fed into the machines where it is melted to liquid, moved by "extruder heads" to a blow station, and blown into the shape of the desired containers. The containers are then conveyed to "downstream" stations where they are successively cooled, trimmed, labeled, and packed for shipment.

Baker assembled and tooled blowmolding machines, but most of the components of the machines were manufactured by others.

Sometime in early 1973, Robert Arvans of Polycon initiated discussions with Baker for the purchase of a B–100 machine for the purpose of producing high-density polyethylene 2 and 2½ gallon containers.

In 1973, 2 and 2½ gallon polyethylene containers were a new product, and Polycon sought to become an early entrant into the market, which grew significantly between 1973 and 1975. Contract negotiations and discussions about the machine's specifications ensued. The parties' agreement for the sale and purchase of the B–100 machine is embodied in three documents: Polycon's purchase order, a letter dated March 22, 1973, by Mr. Arvans on behalf of Polycon, and a letter dated May 26, 1973, by Richard Berger on behalf of Baker. The latter two letters amended the terms and specifications of the purchase order. Delivery of the B–100 was set for June 30, 1973. The agreement called for a 24 hour test run after which, if successful, Polycon would make a downpayment on the machine.

Baker was unable to complete its preparation of the B–100 until October, 1973, at which time a test run was unsuccessfully attempted. A second test run was completed on November 29 and 30, 1973, after which Mr. Arvans, on behalf of Polycon, acknowledged in writing that the required number of bottles had been produced in the 24-hour period as required by the agreement. However, the quality of the bottles was adversely affected by problems with color mixing, jams in the trimmer mechanism, and problems with the molds. Baker assured Polycon that the problems would be corrected, and Polycon agreed to accept the machine and its related equipment on condition that problems with the shear rings and the purge time for color change would be corrected. Baker then drew up a new quotation and sent it, together with a note and security agreement, to Polycon.

Baker was unable to correct the problems with the B–100, and it could not produce commercially acceptable bottles for several months thereafter, primarily because of problems with the machine's molds. On

April 5, 1974, Polycon executed a note and security agreement providing for a downpayment on execution and monthly payments for 12 months. The B–100 was shipped on July 11, 1974, to Polycon's Milwaukee plant. It was understood by the parties that additional modifications would be accomplished after delivery.

In December, 1973, Baker and Polycon discussed the possibility of Polycon purchasing two additional blowmolding machines capable of producing a 1 gallon, "F" style high-density polyethylene Prestone antifreeze container for Polycon's customer, Union Carbide. On December 28, 1973, representatives of Polycon and Baker met and discussed the sale of the two additional machines. Clifford Baker, general manager of Baker, informed Polycon's representatives that the research and development were completed on a machine, the TB, to produce the Prestone container. He advised that Baker had 4 TB machines under fabrication in Japan and that 3 of the machines would be sold to Union Carbide. Union Carbide had plans to produce for itself a quantity of the same Prestone containers to be produced by Polycon. Mr. Baker stated that the remaining TB was available for sale to Polycon. He also suggested that a TA machine was available at Baker's plant and could be converted to produce the Prestone bottle.

Mr. Arvans inquired whether the TA machine had an adequate platen area to handle molds the size of the Prestone container. Mr. Baker responded that he felt the platen area was wide enough but that he would have to verify the matter after examining the machine again. After making this examination, Baker responded that the TA was capable of handling the larger molds, although the machine would be operating at its upper limits.

Mr. Blitstein, president of Crown Glass, asked at the December 28, 1973, meeting whether delivery of the TA and TB would suffer from the same delays which had been encountered with the B–100. He was assured by Mr. Baker that there would be no such delays. The Baker representatives were advised by Polycon's representatives that the timing of delivery of the machines was important because Polycon had a commitment to deliver Prestone containers to Union Carbide in accordance with a shipping schedule. Polycon had entered into an agreement with Union Carbide whereby Union Carbide agreed to purchase the entire output of the two machines, with delivery to commence in March, 1974.

On January 3, 1974, Baker forwarded to Polycon a quotation and offer of sale for the TA and the TB machines. On January 16, 1974, Polycon issued to Baker a purchase order for the TA and TB machines. Its terms required delivery of the TA on February 15, 1974, and the TB on March 15, 1974. Polycon also sent a letter of explanation proposing additional terms. Baker responded to the latter proposals with a letter dated February 4, 1974, amending some of the proposals in Polycon's letter. These documents constitute the basic agreement concerning the TA and TB machines.

Baker was unable to resolve certain problems with the machines and informed Polycon that shipment would be delayed. Polycon strongly objected to the delay and the consequent loss of some sales to Union Carbide, which had turned to another container supplier for containers that were supposed to have been supplied by Polycon. Baker responded that it was trying to correct the problems with the machines before shipment.

On April 16, 1974, the parties met with their attorneys and agreed that the machines would be shipped to Polycon and that Polycon would have the right to return the machines within 90 days and receive a refund of all monies paid if the machines did not meet performance requirements within 90 days of shipment. A security agreement and note were signed by the parties. The TA machine was shipped on April 16, 1974, and the TB machine was shipped on May 21, 1974.

From June to November, 1974, Baker employees remained at the Polycon plant on nearly a full time basis training Polycon's personnel, operating the machines, and repairing the machines and replacing parts.

The B–100 was not ready for operation until October 1, 1974, because certain parts were unavailable and other parts had been taken off the machine for use on the TA and TB machines. The B–100 machine was never placed into continuous production. Its problems were never corrected because the parties were devoting attention primarily to the problems of the TA and TB machines.

Although the TA and TB machines successfully produced 6,220,086 bottles which were sold to Union Carbide, the machines were plagued by mechanical failures on a daily basis, often stopping production for several hours or entire days. Baker formed a task force of its personnel in February 1974, to work on the three machines' problems, but the solutions they came up with either were unsuccessful or were not implemented.

Polycon stopped using the TA machine in March, 1975, and notified Baker that it was rejecting or, alternatively, revoking acceptance of the TA on March 24, 1975, and it stopped using the TA machine at that time. Polycon notified Baker that the TB was rejected or its acceptance was revoked on June 19, 1975, but it continued to use the TB machine until September, 1975, in an effort to mitigate its damages. Polycon notified Baker that the B–100 was rejected or that its acceptance was revoked on July 30, 1975. Polycon purchased two Uniloy machines in February and June, 1975, to replace the TA and TB machines, paying $50,459 over the cost of the TA and the TB.

The adequacy of performance of the Baker machines was the primary factual dispute at trial. Polycon attempted to show that the machines were unable to produce commercially acceptable bottles at the guaranteed rates of output. Baker attempted to show that the machines were capable of producing bottles at the guaranteed output, but that they did not do so due to the lack of experience and turnover of Polycon's personnel, poor housekeeping at the Polycon plant, improper maintenance and inefficient operation of business by Polycon.

Based on a preponderance of the evidence, I find that from the dates of delivery the Baker machines were seriously defective in material and workmanship and were incapable of producing on a sustained basis commercially acceptable bottles at the guaranteed rates of output. The credible evidence does not support the conclusion proposed by Baker that Polycon's losses are attributable to Polycon's own fault. The inefficiencies attributed to Polycon were shown to be only normal incidents of any complex industrial operation.

Of particular persuasive force are the many instances in the record where Baker's own personnel acknowledged the serious problems with the machines. In fact, the majority of Polycon's evidence regarding the defects in the machines came from present or former employees of Baker. In addition, Baker's defense that the problems with the machines were caused by Polycon's personnel evaporates in the face of the evidence that the machines failed to perform satisfactorily when operated by *Baker* personnel for extended periods at the Polycon plant.

Baker's contention that the problems were in the nature of "normal debugging" to be expected of any complex machine is unconvincing. The evidence demonstrates that Baker was never able satisfactorily to repair or replace the numerous defective aspects of these machines.

The agreements for the sale of the three machines each contain the following warranty provision from Baker's quotation and offer of sale:

"Warranty—The Company warrants the Equipment, so far as the same is of its own manufacture, to be free from defects in material and workmanship, when used by the Purchaser under normal conditions, for one year after date of shipment from Company's factories or 4,000 hours of operation whichever occurs first. The Company's obligation under this warranty may, at its option, be discharged by repairing without charge such Equipment or the defective part thereof . . . or at Company's option, by fur-

nishing without charge . . . a similar part to replace any of its own manufacture which proves to have been defective. . . . The Company's obligation hereunder shall be confined to such repair or replacement and shall be further conditioned upon the Company's receiving within said warranty period immediate written notice from the Purchaser upon discovery of any such defect. The warranty obligations of the Company with respect to Equipment parts or accessories not manufactured by the Company shall in all respects conform and be limited to the warranty extended to the Company by its supplier. NO OTHER WARRANTY, WHETHER ORAL, STATUTORY OR IMPLIED, SHALL APPLY TO THE EQUIPMENT AND THE COMPANY SHALL IN NO EVENT BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES NOR SHALL THE COMPANY BE LIABLE BECAUSE THE EQUIPMENT IS NOT ADOPTED TO THE PARTICULAR PURPOSE OF THE PURCHASER OR IS USED FOR PURPOSES OR IN WAYS FOR WHICH IT WAS NOT DESIGNED. The warranty herein specified is subject to the condition that the Purchaser and his (its) agents and employes shall use proper care in the operation of said Equipment and that the press and hydraulic equipment shall not be operated at greater pressure or at higher rate of speed than specified herein, or contrary to operating instructions furnished by the Company to the Purchaser."

The following provision, under the heading "Rated Output", appears in each of the agreements:

"We [Baker] guaranty that the apparatus manufactured by us will deliver successfully its rated output as indicated in the proposal provided such apparatus is properly cared for, operated under normal conditions, and with competent supervision. . . ."

For the B–100 machine, the guaranteed rate of output was 400 units per hour conforming to specifications, and for the TA and the TB machines, the guaranteed rated output was 800 units per hour conforming to specifications.

Also, under the heading "Limited Liability," each agreement contained a provision that "[i]n no event shall the Company be liable for consequential or special damages on account of delay due to any cause nor for any loss or damages arising out of the use, operation or failure of the equipment."

## II.  CONCLUSIONS OF LAW

Baker correctly argues that the parties agreed that Michigan law controls the instant dispute. However, neither party has shown that Michigan law requires a result as to any matter in issue different from the result required by generally applicable principles of tort and contract law, and provisions of the Uniform Commercial Code.

### A.  Misrepresentation Theories

■ I am not persuaded that Polycon has proved its misrepresentation claims by clear and convincing evidence, as required. *Badger Bearing Co. v. Burroughs Corp.*, 444 F.Supp. 919 (E.D.Wis.1977); *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 467 (E.D.Mich.1973).

#### 1.  TA and TB Machines

The first claimed misrepresentation regarding the TA and TB machines was that the research and development was complete for production of the Prestone bottle. I am unconvinced that the representation was false. It is undisputed that the research and development was complete to the extent that the machines could produce Prestone bottles. Facially, therefore, the statement was not false.

To the extent that the representation may have falsely suggested that the machines were developed to the point that they would sustain a Prestone bottle sales program without problems, I find that Polycon's reliance on such a representation would have been unreasonable. The reliance of a plaintiff in an action for misrepresentation must be justifiable reliance. *Kiefer v. Fred Howe Motors, Inc.*, 39 Wis.2d

20, 29, 158 N.W.2d 288 (1968). Prosser, *Law of Torts* (3rd ed.) p. 731, sec. 103.

Polycon's employees were experienced in the area of blow-molding machines. Polycon knew that the TA machine would have to undergo a substantial alteration before it could produce Prestone bottles, and it discussed several other modifications in the specifications for the two machines. Thus, Polycon knew that development work remained to be done on the machines. It follows that Polycon would not have been justified in relying on the representation that all research and development was complete. A contrary finding on this latter point would not help Polycon because, as discussed above, the representation that research and development had been completed for the machines to produce the Prestone bottle was not shown to be false.

The second claimed misrepresentation—that Baker could meet Polycon's schedule for delivery of bottles to Union Carbide—and the third claimed misrepresentation—that the problems with the TA and TB machines would cease when bolted to the floor at Polycon's plant—cannot constitute misrepresentations because they are promises of future performance rather than assertions of existing fact. *Howard v. Reaume,* 310 Mich. 119, 16 N.W.2d 686, 688–89 (1944). A promise of future performance cannot be false when made unless there is a present intent not to fulfill the promise. *Badger Bearing Co. v. Burroughs Corporation,* 444 F.Supp. 919 (E.D.Wis.1977). The evidence does not support the conclusion that Baker did not intend to fulfill the promise when made.

### 2. *B–100 Machine*

Polycon argues that two misrepresentations were made regarding the B–100. First, Polycon contends that Baker's sales manager told Mr. Arvans that the prototype B–100 machine was "working fine," when in fact Baker employees were operating the machine full time because of its problems.

At trial, I consistently rejected evidence pertaining to alleged failure of other machines at other plants on grounds of irrelevancy and confusion of the issues regarding the machines in dispute in this case. For the same reasons, I decline to consider the alleged misrepresentation concerning the prototype machine at the Borden plant.

The second claimed misrepresentation was that Baker would provide new molds for the B–100. This statement is a promise of future performance which, as stated above, is not actionable. Although Polycon also claims that Baker never intended to provide new molds when the statement was made, the evidence does not support this claim.

### B. *Negligence Claims*

Polycon claims that Baker was negligent in several respects. It is argued that Baker "was negligent in entering into the contract" with Polycon when it knew or should have known that it would be unable to fulfill its contractual obligations, and that Baker was negligent "in its method of establishing and operating its engineering department." Polycon also alleges that Baker negligently designed its machinery in several respects.

■ In my opinion, the claim that Baker negligently entered into its agreement with Polycon is insufficient as a matter of law. Although "the breach of a contractual duty may give rise to a tort action predicated upon a failure to carry out the contractual promise to the other party to the agreement," *Peterson v. Sinclair Refining Co.,* 20 Wis.2d 576, 582, 123 N.W.2d 479, 483 (1963), liability cannot be predicated upon a mere failure to exercise due care in deciding whether to enter into a contract.

■ The claim that Baker was negligent in the manner in which it operated its engineering department is also without merit. The law does not impose a duty upon a contracting party to run its business in any particular way for the benefit of the other contracting party; the contract itself prescribes the duty of performance which must be observed.

■ Polycon's claim that Baker was negligent in its design of the machines and in its failure to repair the defects in the machines presents close questions of fact. The evidence supports the conclusion that numerous significant defects and design problems prevented the machines from operating as they should have, but I am not convinced by a preponderance of the evidence that Baker's conduct fell below the standard of ordinary care in the design of their machines. Polycon's proof concentrated on the presence of defects in the machines; the proof regarding Baker's design *conduct* was insufficient. The fact that many of the components of these complex machines were inadequate for the function they were to perform and that repairs and modifications were necessary does not compel a finding that Baker failed to use the care and skill which a reasonable member of the industry would have used under the same or similar circumstances. I therefore find that Baker was not negligent with respect to design or repair of the machines.

## C. *Strict Liability Claim*

Polycon also argues that Baker should be found strictly liable for its sale of defective machines in the ordinary course of its business to Polycon which damaged Polycon in its production of blowmolded bottles.

■■ I agree with the reasoning of the court in *Southwest Forest Industries, Inc. v. Westinghouse Electric Corporation,* 422 F.2d 1013 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970), that the doctrine of strict liability in tort has no application to the sale of a machine between businesses in the same industry where the engineers of both parties negotiated specifications and supervised the machine's construction and testing. The "liability for physical harm . . . caused to the ultimate user or consumer" provided for in section 402A, Restatement of the Law, Torts (2d), does not appear to encompass the type of economic harm sustained by Polycon in the instant transaction.

## D. *Contract Claims*

Two express warranties were made by Baker with respect to each of the three machines. First, Baker warranted the equipment "so far as the same is of its own manufacture, to be free from defects in material and workmanship, when used by the Purchaser under normal operating conditions, for one year after the date of shipment from [Baker]'s factories or 4,000 hours of operation whichever occurs first." Secondly, Baker warranted that each machine would "deliver successfully its rated output as indicated in the proposal provided such apparatus is properly cared for, operated under normal conditions, and with competent supervision." As previously noted, for the TA and TB machines, the guaranteed rated output was 800 conforming units per hour; for the B–100 machine, the guaranteed rated output was 400 conforming units per hour.

■ I find that the three machines did not produce commercially acceptable bottles at the guaranteed rate of output and that they were defective in material and workmanship. I also find that these problems existed from the date of delivery and that the conditions of operation by Polycon were not abnormal. It therefore follows that the express warranties were violated by Baker.

■ Baker argues that the warranty of no defects in material or workmanship was not broken because the components that failed were not of its own manufacture and the warranty is limited to specific components of the machine manufactured by Baker.

I decline to construe the express warranty in the manner proposed by Baker. Polycon purchased an entire system, not an assembly of components. The system was manufactured by Baker, even though all but approximately 10% of the machines' parts were manufactured by others, and thus the warranty must be construed to extend to the system as a whole. See *S–C Industries v. American Hydroponics System, Inc.,* 468 F.2d 852, 855 (5th Cir. 1972). The evidence shows that the machine *sys-*

*tems* failed. It was not shown that particular parts were defective in isolation. Rather, their incorporation in the Baker machines produced a defective product.

In any case, the breach of warranty regarding the guaranteed machine outputs cannot be construed as limited to equipment of Baker's manufacture. The guaranteed-output warranty relates to the production capacity of the assembled apparatus, not the components. Any other reading of the guaranteed-output warranty would be meaningless since component parts themselves have no output; only the assembled machines can be measured in terms of output.

Although it is clear that Baker failed to comply with the delivery date provisions of the contracts, I believe that Polycon waived its right to claim a breach of these provisions by acquiescing in the tardy delivery dates and accepting delivery of the machines. § 2–208, Uniform Commercial Code.

The next question concerns the effect of the contracts' provision limiting Baker's obligation to repairing or replacing defective parts "of its own manufacture," and, with respect to parts not manufactured by Baker, limiting Baker's obligation to that assumed by the supplier of the part in question.

Such limitation-of-remedy provisions are permitted by § 2–719, Uniform Commercial Code. However, the Code "disfavors limitations and specifically provides for their deletion if they would act to deprive a contracting party of reasonable protection against breach." *Chemetron Corp. v. McLouth Steel Corp.*, 381 F.Supp. 245 (N.D. Ill.1974), *aff'd*, 552 F.2d 469 (7th Cir. 1975). Section 2–719(2) provides:

"Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."

The Wisconsin supreme court recently observed that

". . . the purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract . . . within a reasonable time after a defect is discovered.

"Although individual nonconformities may not be substantial in and of themselves, the obligation to repair or replace parts may fail of its essential purpose where the cumulative effect of all the nonconformities substantially impairs the value of the goods to the buyer. . . .

"Where the seller is given reasonable opportunity to correct the defect or defects, and the [article sold] nevertheless fails to operate as should a new [such article] free of defects, the limited remedy fails of its essential purpose. . . . The buyer may then invoke any of the remedies available under the UCC, including the right to revoke acceptance of the goods, under sec. 2–608 of the UCC." *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 420, 421, 265 N.W.2d 513, 520–521 (1978).

I believe that the observations of the Wisconsin court in the *Murray* case are applicable to this case. The limitation of remedy clause, which provided only for repair or replacement of defective parts, failed of its essential purpose—to provide Polycon with goods conforming to the contract within a reasonable time after defects are discovered. The machines' constant breakdowns due to their defective workmanship substantially impaired their value to Polycon, and Baker's many attempts to correct the defects were unsuccessful. I therefore find that the limited remedy failed of its essential purpose, entitling Polycon to invoke other remedies provided by the Code, including revocation of acceptance under § 2–608, Uniform Commercial Code. The fact that this is a nonconsumer transaction is unimportant; a contracting party is entitled to receive the "substantial benefit of the bargain." *AES Technology Systems, Inc. v. Coherent Radiation*, 583 F.2d 933, 940 n.7 (7th Cir. 1978).

Polycon accepted the machines, pursuant to § 2–606, Uniform Commercial Code, when it agreed to retain the ma-

chines, in spite of their nonconformity, while Baker performed repair work at Polycon's plant. I find, however, that Polycon properly revoked acceptance of the three machines.

Under § 2–608, a party is entitled to revoke an acceptance of goods "whose nonconformity substantially impairs [their] value to him" if the goods were accepted "on the reasonable assumption that [their] nonconformity would be cured and [they have] not been seasonally cured," and the revocation of acceptance occurs "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods . . . ."

As previously stated, the inability of the machines to produce commercially acceptable bottles at their guaranteed output substantially impaired their value to Polycon. The evidence demonstrates that the B–100 was accepted after the November, 1973, test run on the basis of Baker's assurances that the problems with the molds, trimmer mechanisms and color dispersion problems would be corrected. The TA and the TB were accepted by Polycon on the basis of Baker's assurances that the problems with those machines would be corrected. It was entirely reasonable for Polycon to have worked with Baker in an attempt to resolve the problems with the machines, and when it became apparent in early 1975 that the non-conformities would not be cured, it seasonally notified Baker that the machines were being rejected or, alternatively, that their acceptance was revoked.

■ I disagree with Baker's argument that the failure of Polycon to return the TA and TB machines within 90 days of shipment, as permitted by the April 16, 1974, agreement, bars Polycon from any other remedy. Section 2–719(1)(b) "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive." Comment 2, § 2–719, Uniform Commercial Code. Baker has not shown that the 90 days return provision was intended by the parties to be exclusive of all other remedies. Such an agreement must be express to be effective under § 2–719.

My conclusion that the limited remedy of repair or replacement failed of its essential purpose does not, however, compel the conclusion that all of the remedies available under the Code are appropriate in this case. In addition to Baker's specific attempt to limit its obligation to repair and replacement, Baker specifically excluded liability for consequential or special damages in both the "warranty" paragraph and in the "limited liability" paragraph of its quotation and offer of sale. Such exclusions of liability for consequential damages are not necessarily unconscionable in commercial transactions. § 2–719(3), Uniform Commercial Code. Parties to commercial transactions should be "left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." Comment 1, § 2–719.

■ In my judgment, the exclusion of consequential and special damages was an allocation of risks agreed to between two commercial parties of equal strength and should be given effect. Although the limited remedy of repair or replacement failed of its essential purpose, it is the court's obligation in this commercial context to go no further than to provide a "fair quantum of remedy" for Baker's breach. Comment 1, § 2–719. To accomplish this, I believe that Polycon should recover as damages so much of the price as it paid for the three machines, $180,432.81, and, in addition, should recover as damages the sum of $50,459, representing the additional cost of the Uniloy machines it purchased to replace the TA and TB machines. §§ 2–711 and 2–712, Uniform Commercial Code. The total recovery of Polycon is therefore $230,891.81.

### CONCLUSION

Therefore, IT IS ORDERED that Polycon Industries, Inc. take $230,891.81, plus costs.

IT IS ALSO ORDERED that the claims and counterclaims of Hercules, Incorporated, be and hereby are dismissed.