KEARNEY & TRECKER CORPORATION, PLAINTIFF-APPEL-LANT, v. MASTER ENGRAVING COMPANY, INC., DEFENDANT-RESPONDENT.

Argued January 21, 1987.—Decided July 7, 1987.

*Stephen N. Dermer* and *Malcolm D. Young,* a member of the Nebraska bar, argued the cause for appellant (*Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor,* attorneys).

*James M. Docherty* argued the cause for respondent (*Cohn & Lifland,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The critical issue posed by this appeal is whether the Uniform Commercial Code, *N.J.S.A.* 12A:1–101 to 10–106 (U.C.C. or Code), permits the enforcement of a contractual exclusion of consequential damages where the buyer's limited remedy authorized in the contract of sale has failed to achieve its essential purpose. Despite a specific exclusion of consequential damages in the contract between these parties, the trial court instructed the jury that it could award consequential damages if the seller, acting under its repair and replacement warranty, did not "make the machine as warranted." The Appellate Division affirmed the judgment entered on the jury verdict assessing

damages against the seller, concluding that "the allocation of risk through exclusion of consequential damages was inextricably tied to the limitation of remedies." *Kearney & Trecker Corp. v. Master Engraving Co.,* 211 *N.J.Super.* 376, 381 (1986). Our analysis of the U.C.C. persuades us, however, that the enforceability of an exclusion of consequential damages does not necessarily depend on the effectiveness of the limited remedies afforded by the contract of sale, and that in this case the exclusion should have been enforced, even though the jury may have determined that the repair and replacement warranty failed of its essential purpose. Accordingly, we reverse the judgment below and remand the matter to the Law Division for a new trial.

I

Kearney & Trecker Corporation (K & T) is the manufacturer of the Milwaukee-Matic 180 (MM–180), a computer-controlled machine tool capable of performing automatically a series of machining operations on metal parts. At the time of trial K & T had sold approximately 700 of these machines throughout the world. Master Engraving Company, Inc. (Master) is engaged in the manufacture and engraving of component parts for industrial application. Organized in 1955, Master operated 22 machines at the time of trial, six of which were computer controlled.

In the fall of 1978, the parties began discussions about Master's purchase of an MM–180. K & T furnished Master with a sales brochure describing the MM–180: "The new Milwaukee-Matic 180 combines simplicity with efficiency. It was designed using fewer parts. It is this simplicity of design that does much to explain the MM 180's amazing low maintenance requirements."

In response to a proposal from K & T, Master issued its purchase order for the MM–180 in December 1978, and the order was promptly acknowledged and accepted by K & T. The

purchase price was $167,000. The written proposal included the following provision:

WARRANTY, DISCLAIMER, LIMITATION OF LIABILITY AND REMEDY: Seller warrants the products furnished hereunder to be free from defects in material and workmanship for the shorter of (i) twelve (12) months from the date of delivery * * * or (ii) four thousand (4,000) operating hours * * *.

*     *     *     *     *     *     *     *

THE WARRANTY EXPRESSED HEREIN IS IN LIEU OF ANY OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IS IN LIEU OF ANY AND ALL OTHER OBLIGATIONS OR LIABILITY ON SELLER'S PART. UNDER NO CIRCUMSTANCES WILL SELLER BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER LOSS, DAMAGE OR EXPENSE OF ANY KIND, INCLUDING LOSS OF PROFITS ARISING IN CONNECTION WITH THIS CONTRACT OR WITH THE USE OF OR INABILITY TO USE SELLER'S PRODUCTS FURNISHED UNDER THIS CONTRACT. SELLER'S MAXIMUM LIABILITY SHALL NOT EXCEED AND BUYER'S REMEDY IS LIMITED TO EITHER (i) REPAIR OR REPLACEMENT OF THE DEFECTIVE PART OF PRODUCT, OR AT SELLER'S OPTION, (ii) RETURN OF THE PRODUCT AND REFUND OF THE PURCHASE PRICE, AND SUCH REMEDY SHALL BE BUYER'S ENTIRE AND EXCLUSIVE REMEDY.

The MM–180 was delivered in March 1980. According to Master's witnesses, the machine malfunctioned frequently during the first year of operation, and was inoperable from 25% to 50% of the time available for its use, substantially more than the industry average of five percent "downtime" for comparable machines. No specific defect was predominant, according to Master's witnesses. Problems with tool changing, control, alignment and spindles were among Master's complaints. Over K & T's objection, testimony was introduced estimating lost profits on customer orders allegedly unfilled because of the inoperability of the machine. It was conceded that the machine's performance improved after the first year and that the machine was still in use at the time of trial, in September and October 1984. Master did not attempt to return the machine to K & T and obtain a refund of the purchase price.

K & T's witnesses disputed Master's account of the machine's first year of operation. Although conceding a substantial num-

ber of service calls, K & T's area service manager testified that only four or five of thirteen service calls were "valid." K & T's service personnel contended that Master had programmed the machine improperly and that the programs were extensively edited, thereby impairing the efficiency of the MM–180. K & T's witnesses testified that Master did not have adequate testing equipment or spare parts for the machine, and that Master's employees lacked the ability to "troubleshoot" and perform regular maintenance. The testimony about "downtime" during the first year was also disputed; the K & T witnesses testified that the MM–180 was not inoperative on most occasions that K & T service personnel visited the Master's plant. K & T's manager of technical services testified that no service calls were requested from May 1981 to March 1982, and that during the second year of operation the MM–180 was operable approximately 98% of the time available for its use.

Suit was instituted by K & T in July 1981 to recover the cost of two service calls made after the one-year warranty had expired; Master counterclaimed, seeking the damages that are the subject of this appeal.

At the conclusion of the trial, the trial court instructed the jury that it could award consequential damages notwithstanding the contractual exclusion if it found that K & T failed "to make the machine as warranted." The jury was not instructed concerning the proof necessary to demonstrate that the repair or replacement warranty had failed of its essential purpose.

The critical portion of the jury charge follows:

You may find that there was an agreement between the parties to limit the remedy in the event that the machine was not as described in the plaintiff's warranties. You may also find that the plaintiff's contract contained a provision which limited the plaintiff's responsibilities in the event the machine was not as warranted to the repair or replacement of defective parts and that that limitation was limiting his liability to the repair or replacement of defective parts. *However, if you find that the plaintiff's actions in repairing and replacing the defective parts did not make the machine as warranted, that is, free from the defects in material and workmanship, then you may find*

*that the defendant is entitled to all of its consequential economic losses and damages despite the language of the contract.* A manufacturer and buyer may agree that only certain warranties shall apply and all others be excluded. Any implied warranty may be excluded if at the time of the sale the manufacturer-seller specifically makes known to the buyer that such warranties are excluded. *Any warranties of the machine center involved in this case was [sic] based upon the assumption that it would be used in a reasonable manner appropriate to the purpose for which it was intended.* (Emphasis added.) [1]

The jury returned a verdict in favor of Master for $57,000. In answer to written questions on the verdict sheet, the jury found that although K & T had not sold a defectively-designed product,[2] it had nevertheless breached its contract with Master. In affirming, the Appellate Division interpreted the jury verdict to mean that the limited remedy of repair and replacement had failed of its essential purpose. *N.J.S.A.* 12A:2–719(2). The Appellate Division concluded that under the circumstance of this case "the failure adequately to repair the machine rendered ineffective the exclusion of consequential damages." 211 *N.J. Super.* at 381.

## II

An understanding of the appropriate relationship between the U.C.C. provisions authorizing the exclusion of consequential damages, *N.J.S.A.* 12A:2–719(3), and the relief available to a buyer when a limited remedy fails of its essential purpose, *id.*

---

[1] The trial court also instructed the jury to consider the representation in the sales brochure about the MM–180's "amazing low maintenance requirements" as constituting an express warranty of the machine's performance. On appeal, the Appellate Division sustained the instruction and admissibility of the sales brochure. *Id.* at 381–82 (citing *Gladden v. Cadillac Motor Car Div.,* 83 *N.J.* 320, 332 (1980)). K & T does not challenge this ruling in its petition for certification.

[2] In its brief to the Appellate Division, Master argued that the jury's indication on its verdict form that the MM–180 was not defectively designed or manufactured should be disregarded. According to that brief, the foreman of the jury told the trial court that the jury had not made any findings, except that there had been a breach of contract. The Appellate Division rejected this argument. *See* 211 *N.J.Super.* at 379–80.

at 12A:2–719(2), is enhanced by reference to the purpose and policies of the Code. These are:

> (a) to simplify, clarify and modernize the law governing commercial transactions;
>
> (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
>
> (c) to make uniform the law among the various jurisdictions. [*Id.* at 12A:1–102(2).]

The Code instructs that it "shall be liberally construed to promote [these] * * * purposes and policies," *id.* at 12A:1–102(1), and that the effect of its provisions "may be varied by agreement," *id.* at 12A:1–102(3). The Official Comments to the Code emphasize that it is to be interpreted in a commercially reasonable manner, and that parties are free to vary its terms through custom, usage or express agreement:

> This Act is drawn to provide flexibility so that, since it is intended to be a semi-permanent piece of legislation, it will provide its own machinery for expansion of commercial practices. It is intended to make it possible for the law embodied in this Act to be developed by the courts in the light of unforeseen and new circumstances and practices. [Comment 1, *N.J.S.A.* 12A:1–102.]

> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> Subsection (3) states affirmatively at the outset that freedom of contract is a principle of the Code: "the effect" of its provisions may be varied by "agreement." The meaning of the statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement. * * * But an agreement can change the legal consequences which would otherwise flow from the provisions of the Act. "Agreement" here includes the effect given to course of dealing, usage of trade and course of performance * * *. [Comment 2, *N.J.S.A.* 12A:1–102.]

*See also Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 *N.J.* 555, 571 (1985) ("Underlying the U.C.C. policy is the principle that parties should be free to make contracts of their choice.").

Under the Code, consequential losses constitute a recoverable item of damages in the event of a breach by the seller. *N.J. S.A.* 12A:2–714(3). However, the potential significance of liability for consequential damages in commercial transactions undoubtedly prompted the Code's drafters, consistent with the Code's endorsement of the principle of freedom of contract, to

make express provision for the limitation or exclusion of such damages. *N.J.S.A.* 12A:2–719.[3] For certain sellers, exposure to liability for consequential damages could drastically affect the conduct of their business, causing them to increase their prices or limit their markets. As one commentator has observed:

> As a general matter, consequential damages exclusions are hands down the most significant limitation of liability in a contract for the sale of goods. Potential liability for consequential damages in commercial contexts, usually in the form of the buyer's lost profits from the use or resale of the goods in its business, is enormous in comparison to the contract price of the goods. On the other hand, the general or direct damages that a buyer may suffer upon a seller's breach are finite and can be gauged at a maximum amount either in terms of the contract price or market price of the goods to be sold. Potential consequential losses are a much different proposition. They can exceed, and most likely will exceed, the value of the goods by an unknown quantum, depending not so much on the actions and machinations of the seller as on the individual operating structure of the buyer and on the buyer's contracts and relationships with third parties. [Anderson, "Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2–719 of the Uniform Commercial Code," 32 *Sw.L.J.* 759, 774 (1977) (hereinafter Anderson).]

In a commercial setting, the seller's right to exclusion of consequential damages is recognized as a beneficial risk-allocation device that reduces the seller's exposure in the event of breach. *V–M Corp. v. Bernard Distrib. Co.*, 447 *F.*2d 864, 869 (7th Cir.1971); *U.S. Fibres v. Proctor & Schwartz, Inc.*, 358 *F.Supp.* 449, 460 (E.D.Mich.1972), aff'd, 509 *F.*2d 1043 (6th Cir.1975); *Beal v. General Motors Corp.*, 354 *F.Supp.* 423, 426 (D.Del.1973).

An equally fundamental principle of the Code, comparable in importance to the right of parties to limit or exclude consequential damages, is the Code's insistence that for a party aggrieved by breach of a sales contract, "at least minimum adequate

---

[3]*N.J.S.A.* 12A:2–719(3) provides:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

remedies be available." Comment 1, *N.J.S.A.* 12A:2–719. To this end, the Code provides that

> [w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act. [*N.J.S.A.* 12A:2–719(2).]

The Code comment explains the purpose of this provision:

> [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article. [Comment 1, *N.J.S.A.* 12A:2–719.][4]

These competing policies—freedom of contract, including the right to exclude liability for consequential damages, and the insistence upon minimum adequate remedies to redress a breach of contract—frame the issue before us. If a limitation or exclusion of consequential damages is not unconscionable when the contract is made,[5] must it be held unenforceable if the limited remedies provided in the contract do not achieve their intended purpose?

To the extent that the U.C.C. addresses this issue, its response is inconclusive. The Code provides merely that when a limited remedy fails of its essential purpose, "remedy may be

---

[4]The New York Law Revision Commission Report emphasizes that Section 2–719(2) "is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties." 1 New York State Law Revision Comm'n, 1955 Report 584 (1955), quoted in J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 12–10 at 466 (2d ed. 1980) (hereinafter White & Summers).

[5]Master has not contended that the exclusion of consequential damages set forth in the contract of sale was "unconscionable" at the time the parties entered into the contract.

had as provided in this Act." *N.J.S.A.* 12A:2–719(2). As noted, consequential damages is a buyer's remedy "provided in this Act," *N.J.S.A.* 12A:2–714(3), but the Code is silent as to whether that remedy survives if the sales contract excludes it.

A related question concerns the extent of the remedies other than consequential damages that are available to a buyer relegated to a limited remedy that has failed to achieve its essential purpose. Typically, the limited remedy most often offered by sellers is the repair and replacement warranty found in the sales contract in this case. *See* Eddy, "On the 'Essential' Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2), 65 *Cal.L.Rev.* 28, 61 (1977) (hereinafter Eddy). When a repair and replacement warranty is combined, as here, with an exclusion of consequential damages, the commercial objectives of the contracting parties are reasonably evident. As summarized in *Beal v. General Motors Corp., supra,* 354 *F.Supp.* at 426:

> The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty.

The commonly-applied formula to compute a buyer's damages for breach of any warranty, including the repair or replacement warranty, is the difference "between the value of the goods accepted and the value they would have had if they had been as warranted * * *." *N.J.S.A.* 12A:2–714(2); *see Chatlos Sys. v. National Cash Register Corp.,* 635 *F.*2d 1081, 1087 (3d Cir. 1980); White & Summers, *supra* § 10–2, at 376. Concededly, in many cases the fair market value of defective goods will be difficult to prove. As White and Summers explain:

> When repair or replacement is not possible, determining the value of defective goods *as accepted* may be more difficult than ascertaining the value as warranted. Several courts have used the price received on a prompt resale as

the appropriate measure. Others have accepted the appraisal testimony of expert witnesses as evidence of actual market value at the time of acceptance. In a few cases, courts have found (or allowed the jury to find) that the value of accepted goods was zero and permitted the buyer to recover the purchase price. [White & Summers, *supra* § 10–2, at 281 (footnotes omitted).]

The Code also affords to the buyer the right to recover incidental damages, *N.J.S.A.* 12A:2–714(3), as well as the right to revoke acceptance of the goods within a reasonable time after discovery of a nonconformity that substantially impairs the value of the goods to the buyer, *N.J.S.A.* 12A:2–608; *see* Eddy, *supra,* 65 *Cal.L.Rev.* at 84. A buyer who revokes his acceptance of goods may also seek damages for the seller's breach. New Jersey Study Comment 2, *N.J.S.A.* 12A:2–608; *N.J.S.A.* 12A:2–711(1).

Courts that have considered the validity of an exclusion of consequential damages in the context of a repair or replacement warranty that has not fulfilled its purpose have reached significantly different results. A substantial number of courts seem to have adopted the view that there is an integral relationship between the exclusion of consequential damages and the limited remedy of repair or replacement, so that the failure of the limited remedy necessarily causes the invalidation of the exclusion of consequential damages. *R.W. Murray, Co. v. Shatterproof Glass Corp.,* 758 *F.*2d 266, 272–73 (8th Cir.1985); *Soo Line R.R. Co. v. Fruehauf Corp.,* 547 *F.*2d 1365, 1373 (8th Cir.1977); *Koehring Co. v. A.P.I., Inc.,* 369 *F.Supp.* 882, 890 (E.D.Mich.1974); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 *F.Supp.* 39, 43–44 (N.D.Ill.1970); *Clark v. Int'l Harvester Co.,* 99 Idaho 326, 344, 581 *P.*2d 784, 802 (1978); *Adams v. J.I. Case Co.,* 125 *Ill.App.*2d 388, 400–04, 261 *N.E.*2d 1, 7–8 (Ill.App. Ct.1970); *Ehlers v. Chrysler Motors Corp.,* 88 *S.D.* 612, 619–22, 226 *N.W.*2d 157, 161–62 (1975); Characteristic of the rationale employed by these courts is this excerpt from the opinion in the *Birdsboro* case:

It is the specific breach of the warranty to repair that plaintiff alleges caused the bulk of its damages. This Court would be in an untenable position if it allowed the defendant to shelter itself behind one segment of the warranty

when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty, which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid. [*Jones & McKnight Corp. v. Birdsboro Corp., supra,* 320 *F.Supp.* at 43–44.]

In sharp contrast, a number of other courts have concluded that an exclusion of consequential damages is to be viewed independently of a limited warranty of repair or replacement, so that if the warranty fails to fulfill its purpose, the validity of the consequential damages exclusion depends upon the specific circumstances and the probable intention of the parties. *Kaplan v. RCA Corp.*, 783 *F.*2d 463, 467 (4th Cir.1986); *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 *F.*2d 427, 434–35 (6th Cir.1983); *Chatlos Sys., Inc. v. National Cash Register Corp., supra,* 635 *F.*2d at 1086; *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 *F.*2d 1363, 1375 (9th Cir.1978); *AES Technology Sys., Inc. v. Coherent Radiation,* 583 *F.*2d 933, 941 (7th Cir.1978); *V–M Corp. v. Bernard Distrib. Co., supra,* 447 *F.*2d at 869; *U.S. Fibres, Inc. v. Proctor & Schwartz, Inc., supra,* 509 *F.*2d at 1048; *Computerized Radiological Servs., Inc. v. Syntex Corp.*, 595 *F.Supp.* 1495, 1510 (E.D.N.Y.1984); *Polycon Indus., Inc. v. Hercules Inc.*, 471 *F.Supp.* 1316, 1325 (E.D.Wis.1979); *American Elec. Power Co., v. Westinghouse Elec. Corp.*, 418 *F.Supp.* 435, 457–59 (S.D.N.Y.1976); *County Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 *F.Supp.* 1300, 1309 (S.D.N.Y.1970), aff'd, 444 *F.*2d 372 (2d Cir.1971).

The Third Circuit's opinion in *Chatlos* is typical of the reasoning articulated in these cases. In *Chatlos,* a manufacturer of telecommunications equipment purchased a computer system from National Cash Register (NCR) to perform a number of bookkeeping and accounting functions. The sales agreement warranted that the system would be free from defects for twelve months, excluded liability for consequential damages, and limited NCR's responsibilities to the correction of any errors or defects within sixty days. *Chatlos Sys., Inc. v. National Cash Register Corp., supra,* 635 *F.*2d at 1084, 1085.

When the computer system's defects could not satisfactorily be corrected by NCR's technicians, Chatlos instituted suit. *Id.* at 1084. The trial court, applying New Jersey law, awarded damages for breach of warranty, *N.J.S.A.* 12A:2–714(2), and also awarded consequential damages for lost profits since it concluded that the contractual exclusion was unenforceable. *Ibid.*

The Third Circuit agreed that the limited repair remedy had failed of its essential purpose, *id.* at 1086, but reversed the trial court's award of consequential damages, concluding that the contractual exclusion of consequential damages should be enforced:

> It appears to us that the better reasoned approach is to treat the consequential damage disclaimer as an independent provision, valid unless unconscionable. This poses no logical difficulties. A contract may well contain no limitation on breach of warranty damages but specifically exclude consequential damages. Conversely, it is quite conceivable that some limitation might be placed on a breach of warranty award, but consequential damages would expressly be permitted.

> The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. *See id.* § 12A:2–719(1)(a); *Beal v. General Motors Corp., supra.* The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

> Whether the preclusion of consequential damages should be effective in this case depends upon the circumstances involved. The repair remedy's failure of essential purpose, while a discrete question, is not completely irrelevant to the issue of the conscionability of enforcing the consequential damages exclusion. The latter term is "merely an allocation of unknown or undeterminable risks." U.C.C. § 2–719, Official Comment 3, N.J.Stat.Ann. § 12A:2–719, at 537 (West 1962). Recognizing this, the question here narrows to the unconscionability of the buyer retaining the risk of consequential damages upon the failure of the essential purpose of the exclusive repair remedy.

> * * * It is also important that the claim is for commercial loss and the adversaries are substantial business concerns. We find no great disparity in the parties' bargaining power or sophistication. Apparently, Chatlos, a manufacturer of complex electronic equipment, had some appreciation of the problems that might be encountered with a computer system. Nor is there a "surprise" element present here. The limitation was clearly expressed in a

short, easily understandable sales contract. This is not an instance of an ordinary consumer being misled by a disclaimer hidden in a "linguistic maze." *Cf. Gladden v. Cadillac Motor Car Division,* 83 N.J. 320, 416 A.2d 394 (1980).

Thus, at the time the contract was signed there was no reason to conclude that the parties could not competently agree upon the allocation of risk involved in the installation of the computer system.

From the perspective of the later events, it appears that the type of damage claimed here came within the realm of expectable losses. Some disruption of normal business routines, expenditure of employee time, and impairment of efficiency cannot be considered highly unusual or unforeseeable in a faulty computer installation. Moreover, although not determinative, it is worth mentioning that even though unsuccessful in correcting the problems within an appropriate time, NCR continued in its efforts. Indeed, on the date of termination NCR was still actively working on the system at the Chatlos plant. In fact, the trial court thought that Chatlos should have cooperated further by accepting the installation of the programs. This is not a case where the seller acted unreasonably or in bad faith.

In short, there is nothing in the formation of the contract or the circumstances resulting in failure of performance that makes it unconscionable to enforce the parties' allocation of risk. We conclude, therefore, that the provision of the agreement excluding consequential damages should be enforced, and the district court erred in making an award for such losses. [635 *F.*2d at 1086–87 (footnotes omitted).]

*See also S.M. Wilson & Co. v. Smith Int'l, Inc., supra,* 587 *F.*2d at 1375 ("Parties of relatively equal bargaining power negotiated an allocation of their risks of loss. Consequential damages were assigned to the buyer, Wilson. The machine was a complex piece of equipment designed for the buyer's purposes. The seller Smith did not ignore his obligation to repair; he simply was unable to perform it. This is not enough to require that the seller absorb losses the buyer plainly agreed to bear."); *AES Technology Sys., Inc. v. Coherent Radiation, supra,* 583 *F.*2d at 941 ("[W]e reject the contention that failure of the essential purpose of the limited remedy automatically means that a damage award will include consequential damages. An analysis to determine whether consequential damages are warranted must carefully examine the individual factual situation including the type of goods involved, the parties and the precise nature and purpose of the contract.") (footnote omitted); *Polycon Indus., Inc. v. Hercules Inc., supra,* 471 *F.Supp.* at 1325 ("[T]he exclusion of consequential and special damages was an

allocation of risks agreed to between two commercial parties of equal strength and should be given effect. Although the limited remedy of repair or replacement failed of its essential purpose, it is the court's obligation in this commercial context to go no further than to provide a 'fair quantum of remedy' for Baker's breach.").

■ We adopt as the better reasoned analysis the approach of the Third Circuit in *Chatlos*. It is consistent with the view articulated by Justice Pollock, writing for the Court in *Spring Motors Distribs., Inc. v. Ford Motor Co., supra* :

As between commercial parties, then, the allocation of risks in accordance with their agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement. [98 *N.J.* at 577.]

We are also persuaded that many routine business transactions would be dislocated by a rule requiring the invalidation of a consequential damage exclusion whenever the prescribed contractual remedy fails to operate as intended. Concededly, well-counseled businesses could avoid the problem posed by better draftsmanship of their sales contracts. *See* White & Summers, *supra* § 12–11, at 470–71. But the commercial reality is that for many sellers, immunity from liability for their customers' consequential damages may be indispensable to their pricing structure and, in extreme cases, to their solvency.

Nor do we find that enforcement of a consequential damages limitation when a limited remedy has failed of its essential purpose is necessarily inequitable to the buyer. As noted earlier, the Code affords remedies other than consequential damages when a warranty is breached. *See supra* at 596–598. Ordinarily, the availability of such remedies will assure the buyer of "a fair quantum of remedy for breach of the obligations or duties outlined in the contract." Comment 1, *N.J.S.A.* 12A:2–719; *see S.M. Wilson & Co. v. Smith Int'l, Inc., supra,* 587 *F.*2d at 1375; *Polycon Inds., Inc. v. Hercules, Inc., supra,* 471 *F.Supp.* at 1325; *see also Chatlos Sys., Inc. v. National Cash Register Corp.,* 670 *F.*2d 1304 (3d Cir.), *cert.* dismissed, 457 *U.S.* 1112, 102 *S.Ct.* 2918, 73 *L.Ed.*2d 1323 (1982)

(affirming the trial court's award on remand of breach-of-warranty damages equal to difference between fair market value of computer system as warranted and value of goods delivered).

■ Accordingly, we conclude that *N.J.S.A.* 12A:2–719 does not require the invalidation of an exclusion of consequential damages when limited contractual remedies fail of their essential purpose. It is only when the circumstances of the transaction, including the seller's breach, cause the consequential damage exclusion to be inconsistent with the intent and reasonable commercial expectations of the parties that invalidation of the exclusionary clause would be appropriate under the Code. For example, although a buyer may agree to the exclusion of consequential damages, a seller's wrongful repudiation of a repair warranty may expose a buyer to consequential damages not contemplated by the contract, and other Code remedies may be inadequate. In such circumstances, a court might appropriately decline to enforce the exclusion. *See* Anderson, *supra,* 31 *Sw.L.J.* at 791–92; *cf.* Eddy, *supra,* 65 *Cal.L.Rev.* at 92–93 (courts should analyze circumstances of each case in deciding whether to enforce consquential damages exclusion).

## III

In this case, a sophisticated buyer purchased for $167,000 a complex, computer-controlled machine tool. The sales agreement allocated to Master the risk of consequential damages. K & T's responsibility was to repair or replace the machine or any defective parts in order that the machine would be "free from defects in material and workmanship" for the shorter of twelve months or four thousand operating hours. The testimony at trial demonstrated that the MM–180 was a complex piece of equipment and that its normal operation could be adversely affected by a wide variety of factors, including deficiencies in maintenance or in computer-programming for which Master's employees were responsible. The machine possessed characteristics analogous to the machine described in *American Electric*

*Power Co. v. Westinghouse Electric Corp., supra,* where an exclusion of consequential damages was upheld despite the failure of a limited remedy:

[T]he rule that the agreed-upon allocation of commercial risk should not be disturbed is particularly appropriate where, as here, the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment. Moreover, compliance with a warranty to repair or replace must depend on the type of machinery in issue. In the case of a multi-million dollar turbine-generator, we are not dealing with a piece of equipment that either works or does not, or is fully repaired or not at all. On the contrary, the normal operation of a turbine-generator spans too large a spectrum for such simple characterizations. [418 *F.Supp.* at 458 (footnote omitted).]

Furthermore, although the sales contract provided for the alternative remedy of return of the machine and refund of the purchase price with K & T's consent, there was no evidence indicating that Master ever attempted to invoke this relief. To the contrary, the evidence indicated that the machine's performance continued to improve and that it was in use at the time of trial, four-and-one-half years after delivery.

Nor was there any contention by Master that K & T did not make service calls when requested. The evidence at trial verified that K & T made at least thirteen service calls during the first twelve months of operation, at times sending several service personnel to work on the Master's machine. What was sharply disputed was Master's claim that the machine was defective during the first year, since K & T's witnesses testified that most of the problems encountered during this period were the fault of Master's employees.

■ Under these factual circumstances, the trial court's instruction to the jury was inappropriate. The jury was charged that it could award consequential damages "despite the language of the contract" if it found that K & T failed "to make the machine as warranted." [6] In our view, the facts in this

---

[6] We would also observe that the jury should have been more thoroughly instructed as to the standards to use in determining whether the limited warranty had failed of its essential purpose. In view of the sharply conflicting

record do not justify invalidation of the consequential damage exclusion, a risk allocation agreed to by both parties. We do not agree with the Appellate Division's conclusion that "the allocation of risk through exclusion of consequential damages was inextricably tied to the limitation of remedies."

■ Master could have offered evidence, although it did not, that the value of the MM–180 was less than the contract price because of the erratic performance during the first year. In such event Master would have been entitled to a jury instruction as to the measure of damages for breach of the repair and replacement warranty. *N.J.S.A.* 12A:2–714(2); *ante* at 596–597. We are fully satisfied that the availability of damages for breach of the repair and replacement warranty under *N.J.S.A.* 12A:2–714(2), combined with the return and refund provision in the contract of sale not invoked by Master, adequately fulfills the U.C.C.'s mandate that "at least minimum adequate remedies be available" when a limited remedy fails to achieve its purpose.

For the reasons stated, the judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for a new trial.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, STEIN and GARIBALDI—7.

*Opposed*—None.

---

testimony as to the cause of the machine's erratic operation during the first year and the extent of its "downtime," a more comprehensive instruction in the context of the evidence adduced would have enhanced the reliability of the jury's verdict.