**Peter McKERNAN and Shirley McKernan, d/b/a Gemini Helicopters**

**v.**

**UNITED TECHNOLOGIES CORPORATION, SIKORSKY AIRCRAFT DIVISION; and General Motors Corporation, Allison Gas Turbine Division.**

**Civ. No. H–87–495(AHN).**

United States District Court, D. Connecticut.

July 10, 1989.

Francis G. Fleming and Daniel M. Kolko, Kreindler & Kreindler, New York City, and Matthew Shaffner, O'Brien, Shaffner, Bartinik, Stuart & Kelly, Groton, Conn., for plaintiffs.

John B. Nolan and Allan Taylor, Day, Berry & Howard, Hartford, Conn., for defendant United Technologies Corp., Sikorsky Aircraft Div.

Patrick Noonan, Wiggin & Dana, New Haven, Conn., and Mark A. Dombroff and Edward Griffith, Washington, D.C., for de-

fendant General Motors Corp. and Allison Gas Turbine Div.

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### NEVAS, District Judge.

The plaintiffs, Peter and Shirley McKernan, doing business as Gemini Helicopters ("Gemini"), bring this diversity action against United Technologies Corporation, Sikorsky Aircraft Division ("Sikorsky"), and General Motors Corporation, Allison Gas Turbine Division ("Allison"). The complaint is cast in two counts, the first alleging breach of warranty and the second negligence. Allison has moved for summary judgment on the breach of warranty count. Both Allison and Sikorsky seek summary judgment on the plaintiffs' cause of action based on negligence. For the reasons discussed below, the defendants' motions for summary judgment on the second count are granted, while Allison's motion for summary judgment on the breach of warranty claim is denied without prejudice to renewal.

## BACKGROUND

Sikorsky designs and manufactures the airframe of the S–76A helicopter, and Allison supplies the engines that are incorporated into the aircraft. Parties who purchase an S–76A receive a warranty on the Sikorsky airframe as part of the purchase

1. The "Sikorsky Fixed Price Sales Agreement," Provision 1(a), provides in part:
   Seller warrants to Buyer that the helicopter(s) sold hereunder will be free from defects in material and manufacture under normal use and service, provided that Seller's liability and Buyer's remedy under this warranty are limited to the repair or replacement, at Seller's election, of helicopter parts which are shown to Seller's reasonable satisfaction to have been thus defective and returned to Seller within 1,000 operational hours after the first use or operation of the helicopter upon which such helicopter part(s) was originally installed, but in no event later than two (2) years after the date of delivery of the helicopter by Seller.

2. The "Allison Model 250–C30 Series New Original Equipment Engine Warranty and Disclaimer," Provision 6, provides in part:
   The obligations of [Allison] under this warranty are limited to the repair or replacement

agreement. Additionally, purchasers receive a copy of the Allison engine warranty, and by reference, this warranty is incorporated into the Sikorsky sales contract.

The plaintiffs are in the air transport business. Since 1979 Peter McKernan has operated a successful Federal Aviation Administration ("FAA")-certified air taxi business for the transportation of corporate executives, and has provided helicopters and crews for several television series. He is a former United States Marine Corps pilot, sophisticated in his knowledge of aviation and familiar with many models of helicopters. In April 1984 Shirley McKernan, as president of Gemini, a Los Angeles, California based partnership, signed a purchase agreement with Sikorsky for an S–76A helicopter, powered by two Allison "250–C305" engines, costing some $2.86 million. Gemini accepted delivery of this aircraft in July of that same year.

The Sikorsky purchase agreement warranted the helicopter against defects in workmanship and materials and for parts not conforming to applicable specifications. The warranty also limited Sikorsky's obligations for defective parts to repair or replacement.[1] Allison's engine warranty similarly limited purchasers' remedies to repair and replacement.[2] Both warranties expressly excluded consequential damages.[3]

(at [Allison's] option) of engines or engine parts as provided herein and do not include any remedy or liability for incidental or consequential damages of any kind, whether for damage to airframe or other property, for costs or expenses of operation of engines, for commercial losses or lost profits due to loss of use or grounding of engines or otherwise.

3. The Sikorsky Fixed Price Sales Agreement, Provision 9—(Liability Limitation), provides:
   With respect to any helicopter or service purchased under this Agreement and alleged to be the cause of any loss or damage to the Buyer, the sum equal to the Invoiced Selling Price of such helicopter or service shall be the ceiling limit on Seller's liability, whether founded in contract or tort (including negligence), arising out of or resulting from (i) this Agreement or the performance or breach thereof, (ii) the design, manufacture, delivery, sale, repair, replacement, or use of any such

In the summer of 1984 Sikorsky performed a series of modifications on the Gemini helicopter. These modifications were mandated by an FAA ruling issued after several S–76A helicopters had crashed. The modifications addressed an engine overheating problem which had caused explosions and resulted in personal injury and loss of life on other S–76A helicopters. While these modifications were being performed, the aircraft incurred downtime and the Gemini partnership purportedly suffered considerable loss of income.

In August 1986 the McKernans sold their helicopter. They contend that the sales price was $800,000 less than they would have received had Sikorsky delivered to them the defect-free product they had bargained for. This economic loss upon resale, together with alleged lost profits, labor expenses, and increased operating costs constitute the core of damages for which the plaintiffs seek relief.

On July 6, 1987 the McKernans, as representatives of a class of S–76A helicopter owners, filed a class action suit against Sikorsky and Allison seeking relief for losses deriving from the Allison engine defects. On June 14, 1988 this court denied Gemini's motion to certify their lawsuit as a class action. *See McKernan v. United Technologies Corp.*, 120 F.R.D. 452 (D.Conn.1988). The plaintiffs are now proceeding solely on their individual claims. In essence, the McKernans contend that Sikorsky and Allison breached their express warranties in that the Allison engine was an inadequate powerplant for the S–76A, inherently incapable of the performance promised, and that Sikorsky negligently designed and manufactured the S–76A, and was negligent by incorporating the Allison engines into the aircraft. Allison was also allegedly negli-

gent in designing and manufacturing the Allison motor and in recommending its incorporation into the helicopter.

In their motions for summary judgment, the defendants argue that the plaintiffs' complaint states no grounds upon which relief can be granted. Specifically, Allison has moved for summary judgment on the breach of warranty count on the grounds that it has fulfilled all obligations under the limited warranty; in the alternative, Allison seeks partial summary judgment on Gemini's claim for consequential damages on the grounds that even if Allison's repair efforts did not constitute an effective remedy, the Allison engine warranty's disclaimer remains operative to exclude recovery for consequential damages.

On the negligence count, both Sikorsky and Allison have moved for summary judgment, arguing that (1) recovery is barred by Connecticut's negligence statute of limitations, and (2) that an action for negligence may not be maintained between commercial parties for economic losses arising from a defective product where there is no injury other than to the product itself.

## DISCUSSION

To prevail on a motion for summary judgment, a movant must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment shall enter, however, "against a party who

helicopter, or (iii) the furnishing of any such service. In no event shall Seller have any liability for any incidental or consequential damages.

The Allison Model 250–C30 Series New Original Equipment Engine Warranty and Disclaimer, in addition to the limiting language in Provision 6 quoted *supra* in footnote 2, provides:

In no event, whether as a result of breach of contract or warranty, alleged negligence or

otherwise, shall Allison be liable for special or consequential damages including, but not limited to, loss of profits or revenue, loss of use of the engine or engine parts or other equipment, cost of capital, cost of substitute equipment, facilities of service, downtime costs, or claims of customers of buyer(s) for such damages.

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Still, all reasonable doubts in the record must be drawn in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Sterling Nat'l Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 875 (2d Cir. 1975). *See also United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir.1982) ("Uncertainty as to the true state of any material fact defeats the motion."). Though summary judgment "is properly regarded not as a disfavored procedural shortcut," *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555, it does not function as a substitute for trial.

> [W]hile the Supreme Court has indicated that trial courts should draw only reasonable inferences in favor of the non-moving party viewing the evidence as a whole, ... and while some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial.

*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252–53 (2d Cir.1987) (citations omitted).

The present controversy will be reviewed in the light cast by these standards. The court first turns its attention to count two, which is challenged by both Sikorsky and Allison.

### A. Count Two

In seeking summary judgment on count two of the complaint, Sikorsky and Allison contend between themselves that the plaintiffs' negligence cause of action for economic loss (1) is not cognizable under Connecticut's Product Liability Act, Conn.Gen.Stat. Section 52–572m *et seq.;* (2) is not cognizable under a recent United States Supreme Court decision, *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) ("*East River*"); and (3) is barred by the three-year statute of limitations contained in Conn.Gen.Stat. Section 52–584. In response to these arguments, the plaintiffs counter that count two is in reality a contract, rather than a tort, claim and that the defendants' negligence analysis is therefore inapplicable and irrelevant.[4]

---

**4.** In this diversity case, the parties presume that Connecticut law applies to resolution of their dispute. As to the breach of warranty claim encompassed by count one of the complaint, there can be no doubt that Connecticut law is applicable. Paragraph 2(b) of the sales agreement between Sikorsky and the plaintiffs fixes Connecticut as the state whose law governs construction of the contract, including the warranty provisions contained in Provision 1. *See supra* note 1. The parties do not address what state's law applies to the tort claim in count two. Invoking Connecticut conflict of laws principles, as required by *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), tort choice of law analysis in Connecticut involves the balancing of interests test embodied in the Restatement (Second) Conflict of Laws. *See, O'Connor v. O'Connor*, 201 Conn. 632, 648–50, 519 A.2d 13, 21–22 (1986).

Under the Restatement approach, a court must determine which state "has the most significant relationship to the occurrence and the parties under the principles stated in [section] 6." 1 Restatement (Second) Conflicts of Law Section 145(1). Section 6 lists factors relevant to the choice of applicable law; these include, for example, "the relevant policies of the forum," "the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue," and "the basic policies underlying the particular field of law." *Id.* Section 6(b), (c), and (e). Certain contacts may be taken into account in applying the principles contained in section 6:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* Section 145(2). Some of the facts necessary for analyzing these contacts appear on the record, but important facts are missing, perhaps because little discovery was done before the defendants brought their Rule 56 motions. On the present record the court will assume that the parties' presumption that Connecticut law applies to the tort claims is correct. The plain-

According to the plaintiffs, count two embodies a claim for negligent performance of a contract. The dispute about the nature of count two arises because the count is inartfully pleaded. It is captioned "A Second Cause of Action Based on Negligence," but then begins by incorporating certain allegations from the breach of warranty claim in count one. At the heart of the cause of action, however, is the following allegation: "Defendant [Sikorsky] negligently designed, tested and assembled the S–76A helicopter so as to incorporate the Allison engines[,] and defendant Allison negligently designed, tested and assembled the Allison engines and negligently recommended and advised [Sikorsky] to incorporate the Allison engines in the S–76A helicopter." Complaint, para. 20. The plaintiffs then seek damages "and other remedies including rescission, revocation of their acceptance of their S–76A aircraft and reimbursement of the purchase price paid and compensatory and consequential damages." *Id.*, para. 21. Despite the "negligence" caption and the tortious nature of the allegations in paragraph 20, the plaintiffs press their contract argument, emphasizing the contractual basis for the remedies sought.

Notwithstanding the plaintiffs' attempts at verbal legerdemain, it is clear to the court that count two sounds more in tort than it does in contract. The only contract between Sikorsky and the plaintiffs was for the sale of an S–76A, not for the design, testing and assembly of the helicopter. The plaintiffs do not allege any negligence in the performance of the sales contract. As to Allison the plaintiffs are on even shakier ground; the engine manufacturer never had a direct contractual relationship with the plaintiffs. The court has no hesitation in characterizing count two as a tort cause of action.

1. *Allison's Product Liability Act Challenge*

■ Allison contends that the plaintiffs' cause of action in negligence is a product

liability claim within the meaning of Conn. Gen.Stat. Section 52–572m(b), which provides that such claims include actions "brought for personal injury, death or property damage caused by the manufacture, construction, design, ... preparation, assembly, [and] installation ... of any product." The complaint alleges as damage the helicopter's diminished capability. According to the plaintiffs, the defective Allison engine diminished the S–76A's performance and safety quotient, and the modifications Sikorsky performed were ineffective in elevating the helicopter's capabilities to the level represented and promised by Sikorsky in the sales contract. An action alleging harm from a product due to negligence may not be pleaded as a separate common law claim but may only be asserted as part of Connecticut's product liability scheme. *Daily v. New Britain Machine Co.*, 200 Conn. 562, 571–72, 512 A.2d 893, 899 (1986). *See also* Conn.Gen.Stat. Section 52–572n(a) (a product liability claim "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."). Clearly, the cause of action asserted by the plaintiffs in count two falls squarely within the meaning of "product liability claim" under section 52–572m(b).

■ Section 52–572n(a) permits recovery for "harm" caused by the product in question. Harm is defined as "damage to property, including the product itself, and personal injuries including wrongful death." *Id.* Section 52–572m(d). However, that same provision also declares that "[a]s between commercial parties, 'harm' does not include commercial loss." *Id.* Another portion of the Product Liability Act reiterates this limitation on "harm" and adds: "An action for commercial loss caused by a product may be brought *only* under, and shall be governed by, title 42a, the Uniform Commercial Code." *Id.* Section 52–572n(c) (emphasis added). The losses which the plaintiffs contend derived from the helicop-

tiffs can hardly argue that they are prejudiced by this conclusion; they have denied throughout these proceedings that count two sounds in

tort and have refrained from addressing the specific tort challenges raised by the defendants.

ter's diminished capability were solely commercial losses, notably diminished proceeds upon resale and loss of income during the downtime required for modifications.[5] The clear language of section 52–572n(c) supports Allison's argument—which is not countered by the plaintiffs—that a legal action for recovery of commercial losses may be brought only under Connecticut's version of the Uniform Commercial Code ("UCC"). *Cf. Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Technologies Corp.*, 116 F.R.D. 397, 418–19 (D.Conn.1987) (Clarie, J.) (plaintiff permitted to sue in negligence for purely commercial loss only because suit was commenced prior to the June 14, 1984 effective date of section 52–572n(c)). The court concludes that section 52–572n(c) precludes count two of the complaint. Therefore, the court grants Allison's motion for summary judgment as to count two.

### 2. *Sikorsky's Common Law Challenge*

■ In seeking summary judgment on count two, Sikorsky did not pursue Allison's product liability argument, though the helicopter manufacturer would clearly be covered by the provisions of Connecticut's product liability statutes. Instead, Sikorsky relied on the *East River* case for the argument that commercial losses are not compensable in tort. In that case the defendant designed, manufactured, and supervised the installation of propulsion engines in four oil-transporting supertankers. 476 U.S. at 859. The turbine engines in one ship malfunctioned soon after installation; the damaged parts were eventually repaired in satisfactory fashion with new parts designed and manufactured by the defendant. The other three ships also experienced engine problems that were alleviated after repairs had been done. The plaintiffs, the charterers of the four ships, sued in negligence and strict liability for commercial losses, including income lost while the ships were out of service, arising out of the engines' design and manufacturing defects. *Id.* at 860–61, 106 S.Ct. at

2296–97. In a unanimous decision, the Court held that a commercial party may not sue in tort to recover economic damages arising from a defective product where there has been no injury to persons or property damage other than to the product itself. *Id.* at 876, 106 S.Ct. at 2304.

In so holding, the *East River* Court characterized product liability law as a response to the need to offer persons injured by dangerous products a greater degree of protection than that provided by the law of warranty. *Id.* at 866, 106 S.Ct. at 2299–2300. The court noted that this concern for public safety is reduced when an injury occurs only to the product itself. According to the Court,

> [d]amage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' ... The maintenance of product value and quality is precisely the purpose of express and implied warranties....
>
> Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. ... In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, ... we see no reason to intrude into the parties' allocation of the risk.

*Id.* at 872–73, 106 S.Ct. at 2302–03 (citations omitted). Moreover, the Court found it more desirable and eventually less expensive to have liability for injuries to a product itself limited by the principles applicable to warranty causes of action than to expose a manufacturer to tort damages of

---

**5.** In their Local Rule 9(c)(2), R.Civ.P. (D.Conn.), statement, the plaintiffs represent that they are seeking property damages. This conclusion, however, is not elaborated on, and the court finds no reference in the complaint to property damages sustained by the plaintiff's helicopter.

an indefinite amount. *Id.* at 874, 106 S.Ct. at 2303–04.

The *East River* case was decided in an admiralty context, but its persuasiveness has been recognized in other situations. *See, e.g., King v. Hilton–Davis*, 855 F.2d 1047, 1050–54 (3d Cir.1988) (*East River* principles applicable in case involving allegedly defective sprout suppressant used on seed potatoes); *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 117 (3d Cir.) (in a diversity case involving fire damage to a tractor shovel, the court, applying Pennsylvania law, found that *East River* Court's analysis "so persuasive that it will be followed by Pennsylvania courts"), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Florida Power & Light Co. v. McGraw Edison Co.*, 696 F.Supp. 617, 619–20 (S.D.Fla.1988) (*East River* relevant to case involving economic damages caused by transformer explosion at power-generating plant). The reasoning of *East River* is consistent with the distinctions drawn between consumers and commercial parties in the Connecticut Product Liability Act and underscores the policy considerations that validate the statutory scheme. The court also grants Sikorsky's summary judgment motion as to count two.[6]

## B.  *Count One*

In their breach of warranty claim, the plaintiffs allege that Allison engines, when run at safe operating temperatures, lack sufficient capacity to power an S–76A helicopter. As a consequence, the engines have been operated at unsafe, elevated temperatures, resulting in engine explosions and numerous maintenance problems. According to the plaintiffs, the defendants "expressly warranted ... that the S–76A helicopter was safe and capable of performing to certain operating and performance standards." Complaint, para. 14. By providing the plaintiffs with an aircraft powered with inadequate engines, Sikorsky and Allison purportedly breached the express warranties. Moreover, the plaintiffs al-

lege, the limited remedy of repair or replacement provided in the warranties "failed of its essential purpose" because such remedy was incapable of correcting the basic design flaw that resulted when Allison engines were selected to power the S–76A. *Id.*, para. 17. The plaintiffs seek rescission, revocation of acceptance of the S–76A, reimbursement of the purchase price and compensatory and consequential damages.

In pursuing summary judgment on this count, Allison argues that it has fulfilled its obligations to the plaintiffs under the engine limited warranty, incorporated by reference into the Sikorsky warranty. *See supra* note 2. The plaintiffs acknowledge that the Allison engine warranty limits Allison's obligations to repair or replacement of engines or engine parts, but contend that the FAA-mandated modifications made to their S–76A did not constitute an adequate remedy. The McKernans further argue that the UCC permits relief under all applicable code provisions when an exclusive remedy—such as the repair or replacement remedy at issue here—fails of its essential purpose. In counterpoint, Allison denies that its exclusive remedy failed and argues, in the alternative, that even if the modifications were an insufficient remedy, the defendant's disclaimer as to consequential damages precludes recovery of the plaintiffs' economic losses, all of which are characterized by Allison as consequential in nature.

### 1.  *Failure of Essential Purpose*

▮ The Allison engine warranty expressly provides that Allison is not liable "for incidental or consequential damages of any kind ... [including] commercial losses or lost profits due to loss of use or grounding of engines or otherwise." *See supra* note 2. According to Allison, the UCC, as adopted by Connecticut, recognizes the validity of such exclusionary clauses. Conn. Gen.Stat. Section 42a–2–316(4) provides in pertinent part that "[r]emedies for breach of warranty can be limited in accordance

---

**6.** Because Allison and Sikorsky have established bases for granting their Rule 56 motions, the court declines to address their statute of limitations challenges.

with the provisions of ... section 42a–2–719 on contractual modification of remedy." In relevant part, Conn.Gen.Stat. Section 42a–2–719(1) provides that

> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

Allison argues that the plain language of the exclusionary clause in the engine warranty, when read in the light cast by section 42a–2–719, provides the plaintiffs with a remedy of repair or replacement only. "No other remedies are contemplated under the warranty—not consequential damages or commercial loss, not rescission, not revocation. The warranty plainly and explicitly allocates the risk of commercial loss to Gemini." Memorandum of Law of Defendant Allison Gas Turbine and Defendant General Motors Corporation in Support of Defendants' Motion for Summary Judgment at 17.

There exists a narrow exception to the principle that commercial parties are free to limit the scope of remedies available under the UCC. Conn.Gen.Stat. Section 42a–2–719(2) provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." Not surprisingly, the plaintiffs focus on this provision in opposing Allison's Rule 56 motion. Simply put, the plaintiffs argue that no amount of repair or replacement with similar engines would correct the inherent defect in the S–76A helicopter: the marriage of the inadequate Allison gas turbine engines with the Sikorsky airframe.

Allison contends that the FAA-ordered modifications provided adequate remedy because they removed any substantial concerns regarding the helicopter's safety and performance. In reaching this conclusion, Allison relies in part on the recently decided case of *Damin Aviation Corp. v. Sikorsky Aircraft, A Div. of United Technologies Corp.*, 705 F.Supp. 170 (S.D.N.Y.) ("*Damin*"), summarily aff'd, 880 F.2d 1318 (2d Cir.1989). There, the plaintiff, also a sophisticated operator of business transport by helicopter, sought relief from Sikorsky and Allison for commercial losses stemming from the crash of an S–76A. The helicopter sales agreement in *Damin* contained express warranties identical to those at issue in the instant matter. The *Damin* court held, in a summary judgment context, that the plaintiff's commercial losses were precluded by the disclaimers in the warranty provisions. *Id.* at 178–79. Specifically, the court found that the limited warranty of repair or replacement did not fail because the plaintiff had been reimbursed the helicopter's full price, which the plaintiff then used to purchase another S–76A equipped with the same model Allison engines as present in the original helicopter. *Id.* The court applied Connecticut law on the warranty issue and concluded:

> Since the defendants were able to replace the [first] [h]elicopter within a reasonable time, [the plaintiff] has not lost a substantial benefit of its bargain. A limited remedy fails of its essential purpose only where, because of circumstances that develop after the formation of the contract, the limited remedy operates to deprive a party of a substantial benefit of the bargain....

*Id.* at 178–79 (citing Conn.Gen.Stat. Section 42a–2–719, comment 1). In Allison's view, the facts in *Damin* are indistinguishable from those before the court in this proceeding. In each instance, the helicopter owner received the substantial benefit of its bargain—in *Damin*, a new helicopter; here, a modified S–76A in which the engine overheating problem had been corrected.

Allison's argument is not thoroughly persuasive, however. The plaintiff in *Damin* received a dollar amount exceeding the purchase price of the original helicopter; this amount constituted full replacement value. That the plaintiff then voluntarily chose to use the insurance proceeds to purchase a

second S–76A would seem irrelevant. Conversely, the plaintiffs here did not have the option afforded the *Damin* helicopter owner. Allison never offered the McKernans the full replacement value of the aircraft or the engines. The modifications were the only remedy offered. The alterations allegedly removed safety and performance concerns by ensuring that if an overheated engine exploded, the explosion would be contained away from other engines and steering and control mechanisms. According to the plaintiffs, the modifications removed some risks emanating from the underlying defect but did not correct the defect. If true, the plaintiffs received a remedy but possibly not the substantial benefit of their bargain. Whether the modifications made by Allison were truly adequate to restore such benefit to the plaintiffs is a genuine issue of material fact not resolvable on the undeveloped record now before the court. Whether a limited remedy failed of its essential purpose is, in most instances, a fact-laden issue inappropriate for determination on summary judgment. *See, e.g., Connecticut Printers, Inc. v. Baker Perkins PMC, Ltd.*, Civ. No. H–86–1507, slip op. at 7 n. 4 (D.Conn. May 10, 1989) (Dorsey, J.); *Cole Energy Dev. Co. v. Ingersoll–Rand Co.*, 678 F.Supp. 208, 210 & n. 1 (C.D.Ill.1988); *KKO, Inc. v. Honeywell, Inc.*, 517 F.Supp. 892, 896 n. 3 (N.D. Ill.1981).[7]

### 2. *Consequential Damages*

■ Anticipating the contingency that the court might find that there exists an issue of triable fact on whether Allison's modifications were substantial enough to overcome the plaintiffs' argument on failure of essential purpose, the defendant asserts that summary judgment is still appropriate as to the claims for consequential damages. The plaintiffs rely on section 52a–2–719(2) in opposing this argument. As noted earlier, that provision states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, *remedy may be had as provided in this title.*" Conn.Gen.Stat. Section 42a–2–719(2) (emphasis added). According to the plaintiffs, the underscored language makes clear that Allison's warranty disclaimer as to consequential damages is invalidated if the defendant's limited remedy fails of its essential purpose. In other words, section 42a–2–719(2) permits the plaintiffs to ignore the engine warranty and pursue all the buyer's remedies available in Connecticut's formulation of the UCC. Allison contends, however, that even if section 42a–2–719(2) is called into play and the plaintiffs are afforded access to other UCC remedies, that access is limited by subsection (3) of section 42a–2–719, which provides: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is *prima facie* unconscionable but limitation of damages where the loss is commercial is not." Conn.Gen.Stat. Section 42a–2–719(3). Neither the plaintiff nor Allison has identified, nor has research divulged, a Connecticut appellate court deci-

---

**7.** To buttress its argument that no genuine issue of material fact remains, Allison draws upon what it characterizes as admissions made by the plaintiffs during an earlier phase of this litigation. According to the defendant, plaintiff Peter McKernan, in an affirmation submitted in support of the plaintiffs' unsuccessful attempt at class action certification, acknowledged that the modifications mandated by the FAA had adequately remedied the power problems his S–76A had been experiencing. Allison also highlights a purported admission that appeared in the plaintiffs' memorandum of law on such certification. In opposition to the defendants' motions for summary judgment, the plaintiffs have submitted an affidavit by Peter McKernan. After reviewing the affirmation, memorandum,

and affidavit, the court remains convinced that triable issues of fact remain on the failure of essential purpose issue. In numerous places, the plaintiffs make clear their belief that the modifications did not correct the design flaw that resulted from the conjoining of the Allison engines with the Sikorsky airframe. The court is mindful that little or no discovery has taken place in this case. At this juncture in the suit, it would be inappropriate to conclude that summary judgment is mandated on this issue. Allison is free to renew its summary judgment motion at the conclusion of discovery; perceived inconsistencies in the plaintiffs' position can be evaluated after the contours of the litigation have been more fully delineated.

sion on the interrelationship between subsections (2) and (3) of section 42a–2–719. Courts in other jurisdictions are split on this issue, but two general interpretations have emerged.

Some courts regard subsections (2) and (3) as interdependent, thus allowing recovery of consequential damages, despite a contractual disclaimer of liability for these damages, when an exclusive or limited remedy fails of its essential purpose. *See, e.g., Fidelity & Deposit Co. of Maryland v. Krebs Engineers,* 859 F.2d 501, 504–05 (7th Cir.1988) (interpreting Wisconsin law); *R.W. Murray, Co. v. Shatterproof Glass Corp.,* 758 F.2d 266, 272–73 (8th Cir.1985) (interpreting Missouri law); *Soo Line R.R. v. Fruehauf Corp.,* 547 F.2d 1365, 1373 (8th Cir.1977) (interpreting Minnesota law); *Riley v. Ford Motor Co.,* 442 F.2d 670, 673–74 (5th Cir.1971) (interpreting Alabama law); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 381–82 (E.D.Mich.1977) (interpreting Michigan law). The rationale behind the interdependence of subsections (2) and (3) is that where a limited or exclusive remedy has failed under (2), it would be unfair to allow a disclaimer under (3) because the buyer when agreeing to the disclaimer was under the impression that the contractual remedy would be effective.

Many courts have rejected this analysis and, as Allison correctly asserts, the current trend is to characterize an exclusionary contractual provision as a discrete and independent agreement whose validity is to be judged by the standards prescribed in subsection (3) of section 42a–2–719. Courts upholding bargained-for exclusions of consequential damages recognize that the overall purpose of section 42a–2–719 is to facilitate parties' freedom to allocate risk. *See* Conn.Gen.Stat. Section 42a–2–719, comment 3 (clauses limiting or excluding consequential damages "are merely an allocation of unknown or undeterminable risks"). Subsection (3) places no restrictions on the allocation of risk for absorption of commercial loss, except that such allocation must not be unconscionable. In *Chatlos Sys., Inc. v. NCR Corp.,* 635 F.2d 1081, 1086 (3d Cir.1980), the court, interpreting New Jersey law, recognized the non-contingent nature of UCC Sections 2–719(2) and 2–719(3):

It appears to us that the better reasoned approach is to treat [a] consequential damage disclaimer as an independent provision, valid unless unconscionable. This poses no logical difficulties. A contract may well contain no limitation on breach of warranty damages but specifically exclude consequential damages. Conversely, it is quite conceivable that some limitation might be placed on a breach of warranty award, but consequential damages would expressly be permitted.

The limited remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty. [Citations omitted.] The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold, as a general proposition, that the failure of the limited remedy provided in the contract, without more, invalidates a wholly distinct term in the agreement excluding consequential damages. The two are not mutually exclusive.

The sixth circuit emphasized statutory construction in stressing the independent natures of subsections (2) and (3):

[A]bsent the specific language of subsection (3), the general language of subsection (2) would seem to cover the issue of consequential damages. Since it is a basic principle of statutory construction that the particular governs over the general, we believe that the section 2–719 drafters intended subsection (3) to deal with the issue of consequential damages.

*Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co.,* 709 F.2d 427, 435 (6th Cir.1983) ("*Lewis*"). The *Lewis* court also distinguished "the distinctly different substantive content" of the two subsections. *Id.* Noting the distinction made in subsection (3) between consumers and commercial parties, and the

presumption that an exclusionary clause in a consumer transaction is *prima facie* unconscionable, the court found that "subsection (3) is a powerful provision designed to protect against abuse of consumers in contract formation." *Id.* The court also concluded, however, that a second principle underpins the subsection:

> The Official UCC comment to UCC 2–719(3) indicates ... that another basic purpose of subsection (3) is to allow merchants to allocate business risks. This purpose is consonant with the general UCC philosophy of freedom in commercial transactions. Taking these two statutory policies together, we believe that section 2–719(3) is meant to allow freedom in excluding consequential damages unless a consumer is involved in the contract. This freedom would be abridged by [a] sweeping interpretation of subsection (2)....

*Id.*

Allison relies in part on *Chatlos* and *Lewis* to support its claim that the disclaimer for consequential damages in the engine warranty is valid even if the sales agreement remedy of repair or replacement failed of its essential purpose. Two influential commercial law commentators reinforce Allison's argument. In evaluating the friction that can occur between subsections (2) and (3) when a limited or exclusive remedy fails of its essential purpose, White and Summers note that a "deep division" of opinion exists on whether the subsections are mutually exclusive in such circumstances but that the better line of cases is the one according independent status to the subsections. J. White & R. Summers, *Uniform Commercial Code*, Section 12–10 at 526–27 (3d ed.1988). "Those cases seem most true to the Code's general notion that the parties should be free to contract as they please.... Believing the parties to know their own interests best, we would leave the risk allocation to the parties." *Id.* Section 12–10 at 527–28.

A federal court sitting in diversity must follow the law determined by the highest court of the state whose law is applicable to resolution of the dispute. *Plummer v.*

*Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). When that state court has not directly ruled on the issue under consideration, the federal court " 'must make an estimate of what the state's highest court would rule to be its law.' " *Carpentino v. Transport Ins. Co.*, 609 F.Supp. 556, 560 (D.Conn.1985) (Zampano, J.) (quoting *Cunningham v. Equitable Life Assurance Soc'y of the United States*, 652 F.2d 306, 308 (2d Cir.1981)). In calculating this estimate, the federal court may consider all data the high court would use in reaching its decision. *Doyle v. St. Paul Fire & Marine Ins. Co.*, 583 F.Supp. 554, 555 (D.Conn.1984) (Dorsey, J.).

Obliged to engage in the uncertain task of predicting what the Connecticut Supreme Court would likely do with this issue, the court concludes that the state high court would find persuasive the approach recently taken by the New Jersey Supreme Court in *Kearney & Trecker Corp. v. Master Engraving Co.*, 107 N.J. 584, 527 A.2d 429 (1987) ("*Master Engraving* "). There, the plaintiff manufactured a computer-controlled tool used in the machining of metal parts. The defendant manufactured and engraved components for industrial application. *Id.* at 587, 527 A.2d at 430. The defendant purchased one of the tools in 1978; the sales agreement contained clauses excluding consequential damages and limiting the buyer's remedy to either repair or replacement of the defective part, or, at the seller's option, return of the product and refund of the purchase price. *Id.* at 588, 527 A.2d at 431. The machine malfunctioned and was inoperable for periods exceeding the average "downtime" in the industry. *Id.* At trial the court instructed the jury that it could award consequential damages, notwithstanding their contractual exclusion, if the jury found that "the plaintiff's actions in repairing and replacing the defective parts did not make the machine as warranted, that is, free from the defects in material and workmanship...." *Id.* at 589, 527 A.2d at 432. The jury returned a verdict for the buyer; the intermediate appellate court affirmed, interpreting the verdict to mean that the limited remedy of repair or replacement had failed of its es-

sential purpose, thus rendering ineffective the contract provision excluding recovery of consequential damages. *Id.* at 590, 527 A.2d at 432.

In reversing the lower appellate court, the supreme court began its analysis by emphasizing that the exclusion of consequential damages in commercial transactions is consistent with the UCC's principle that parties should be free to make contracts of their choice. *Id.* at 591, 527 A.2d at 433. The *Master Engraving* court also stressed how important risk allocation for consequential damages can be in commercial contracts:

> As a general matter, consequential damages exclusions are hands down the most significant limitation of liability in a contract for the sale of goods. Potential liability for consequential damages in commercial contexts, usually in the form of the buyer's lost profits from the use or resale of the goods in its business, is enormous in comparison to the contract price of the goods. On the other hand, the general or direct damages that a buyer may suffer upon a seller's breach are finite and can be gauged at a maximum amount either in terms of the contract price or market price of the goods to be sold. Potential consequential losses are a much different proposition. They can exceed, and most likely will exceed, the value of the goods by an unknown quantum, depending not so much on the actions and machinations of the seller as on the individual operating structure of the buyer and on the buyer's contracts and relationships with third parties.

*Id.* at 592, 527 A.2d at 433 (quoting Anderson, *Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2-719 of the Uniform Commercial Code*, 32 Sw. L.J. 759, 774 (1977)). Balanced against the UCC policy on freedom of contract, however, is the equally significant policy that at least minimum adequate remedies be available for a party aggrieved by breach of the sales contract. 107 N.J. at 592-93, 527 A.2d at 433-34.

Finding that the UCC is inconclusive on the interrelationship between subsections (2) and (3) of section 2-719, the supreme court reviewed the sharply contrasting cases on the issue before adopting as "the better reasoned analysis" the view articulated by the Third Circuit Court of Appeals in *Chatlos. Id.* at 599, 527 A.2d at 437.

> We are ... persuaded that many routine business transactions would be dislocated by a rule requiring the invalidation of a consequential damage exclusion whenever the prescribed contractual remedy fails to operate as intended. Concededly, well-counseled businesses could avoid the problem posed by better draftsmanship of their sales contracts.... But the commercial reality is that for many sellers, immunity from liability for their customers' consequential damages may be indispensable to their pricing structure and, in extreme cases, to their solvency.
> Nor do we find that enforcement of a consequential damages limitation when a limited remedy has failed of its essential purpose is necessarily inequitable to the buyer.... [T]he [UCC] affords remedies other than consequential damages when a warranty is breached.... Ordinarily, the availability of such remedies will assure the buyer of 'a fair quantum of remedy for breach of the obligations or duties outlined in the contract.'

*Id.* at 599, 527 A.2d at 437-38 (quoting N.J.Stat.Ann. Section 12A:2-719, comment 1) (citations omitted). In concluding that subsections (2) and (3) are not necessarily interdependent, the *Master Engraving* court added a caveat; subsection (2) may override subsection (3) "when the circumstances of the transaction, including the seller's breach, cause the consequential damage exclusion to be inconsistent with the intent and reasonable commercial expectations of the parties...." *Id.* at 600, 527 A.2d at 438. Thus, a court should analyze the circumstances of a case when deciding whether to enforce a consequential damages exclusion. *Accord Chatlos,* 635 F.2d at 1086 ("Whether the preclusion of consequential damages should be effective in this case depends upon the circumstances involved.").

■ On the fully developed record before it—including evidence adduced at tri-

al—the *Master Engraving* court concluded that "the facts in this record do not justify invalidation of the consequential damage exclusion, a risk allocation agreed to by both parties." 107 N.J. at 601, 527 A.2d at 439. By contrast, little discovery has taken place in the instant proceeding, and the record before the court is thus far short of complete. Soon after the McKernans filed suit, the defendants initiated their challenges to the plaintiffs' class action allegations. When those motions were resolved in June of last year, Allison and Sikorsky's summary judgment motions followed a short time later. Moreover, pending resolution of the Rule 56 motions, a protective order has been in place prohibiting the plaintiffs from conducting discovery. Though Allison contends that it has provided sufficient documentation to support its motion as to count one, the court refrains from considering the "circumstances of the transaction" until discovery is completed. *Id.* at 600, 527 A.2d at 438. At that time, Allison will be free to renew its summary judgment motion, and the court will then determine whether the consequential damage exclusion in the Allison engine warranty is "inconsistent with the intent and reasonable commercial expectations of the parties...." *Id.*[8]

The court denies without prejudice Allison's motion for summary judgment as to count one.

## CONCLUSION

For the foregoing reasons, the court (1) grants the defendants' motions for summary judgment as to count two, and (2) denies without prejudice Allison's motion for summary judgment as to count one. The court also vacates the protective order currently staying discovery in this case. Counsel for the parties should expeditiously contact the undersigned's scheduling clerk to arrange a discovery scheduling conference.

SO ORDERED.

---

**8.** As noted earlier in the text, Conn.Gen.Stat. Section 42a–2–719(3) permits risk allocation of consequential damages by commercial parties unless the allocation is unconscionable. Presumably, a finding of unconscionability would satisfy the "circumstances" test espoused by the *Master Engraving* court—though it is not clear whether that court would invalidate an exclusion provision that is something less than unconscionable. In any event, when the consequential damages issue is revisited after the completion of discovery, the court will include in its analysis a section on unconscionability. For the present, the court offers as dictum the following background on how unconscionability will be assessed.

Unconscionability is a question of law to be resolved by a court. *See* Conn.Gen.Stat. Section 42a–2–302 (finding of unconscionability left to "the court as a matter of law...."); *Texaco, Inc. v. Golart,* 206 Conn. 454, 461, 538 A.2d 1017, 1021 (1988) (unconscionability a matter of law

to be decided by a court based on all the facts and circumstances in case). The litmus test for measuring unconscionability is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Conn.Gen.Stat. Section 42a–2–302, comment 1. *See also Hamm v. Taylor,* 180 Conn. 491, 495–96, 429 A.2d 946, 949 (1980). Courts have considered several factors when applying this test: the good faith of the parties, the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause. *Damin,* 705 F.Supp. at 177 (citing *Kaplan v. RCA Corp.,* 783 F.2d 463, 467 (4th Cir.1986), and *Golart,* 206 Conn. at 462, 538 A.2d at 1021).